**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 11a0480n.06

**Nos. 10-1382/1422**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| DAVID PERSHELL, | ) |
| | ) ON APPEAL FROM THE |
| Plaintiff - Appellee, | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE WESTERN |
| v. | ) DISTRICT OF MICHIGAN |
| | ) |
| JOSEPH COOK; JEFFREY | ) |
| MIAZGA; ANDREW WILLIAMS, (No. 10-1382) | ) |
| | ) |
| SHAWN MARTIN, (No. 10-1422) | ) |
| | ) |
| Defendants - Appellants. | |

_____

```
┌──────────────────────────┐
│         FILED            │
│                          │
│      Jul 13, 2011        │
│                          │
│   LEONARD GREEN, Clerk   │
└──────────────────────────┘
```

**Before: KEITH, GIBBONS, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Defendant police officers appeal the district court's denial of qualified immunity and state-law immunity in Plaintiff David G. Pershell's § 1983 suit alleging excessive use of force during Pershell's arrest on a misdemeanor arrest warrant. Defendants argue that Pershell failed to individually identify the wrongdoing of the defendants, and that even if he did, the force allegedly used during the arrest was objectively reasonable. Defendants also argue that they are entitled to immunity against Pershell's state-law assault and battery claim. We AFFIRM.

**I**

On February 5, 2007, Pershell, a resident of Baroda, Michigan, called 911 after getting into a verbal and physical altercation at his home with an acquaintance who refused to leave the house.

Before police arrived at Pershell's home, the acquaintance left the house voluntarily. Pershell then called 911 again to report that he no longer required police assistance. A 911 dispatch employee informed Pershell that an officer would still need to respond to take a report.

Unbeknownst to Pershell, police had an outstanding warrant for his arrest on a misdemeanor charge of recklessly discharging a firearm while under the influence of alcohol. That warrant arose out of an incident on December 23, 2006, when police responded to a report of gunshots at Pershell's residence.[1] Police did not arrest Pershell at the time but subsequently secured a misdemeanor warrant for his arrest. When police received Pershell's 911 call on February 5, 2007, they decided to serve the warrant on him while responding to the call. Officer Shawn Martin of the Baroda-Lake Township Police Department was the primary responding officer. He requested backup and was accompanied to Pershell's house by Officer Dean Jones of the Bridgman Police Department and Troopers Jeffrey Miazga, Andy Williams, and Joseph Cook of the Michigan State Police.

Once the police arrived at the house, Martin knocked and announced himself, and Pershell invited Martin to enter. Martin and Jones entered the residence. Pershell and Martin exchanged pleasantries as they walked to the living room; according to Pershell, Jones was already in the living room by this time. Upon entering the living room, Pershell saw that Jones was pointing a taser at

---

[1]When police responded to the report of gunshots fired at Pershell's residence, Pershell refused to exit the house to talk with police or to allow police access to the house. A standoff ensued over the course of several hours during the middle of the night, with police surrounding the house and Pershell at one point threatening to shoot anyone who approached his house. Once police determined that no individuals were being held in Pershell's residence against their will, they moved back from the house. After observing the residence for another two hours and seeing no activity, police left the scene.

him and heard Jones repeat "I've got a taser" two or three times. Martin then informed Pershell that he was under arrest. Pershell responded by exclaiming, "You're crazy. Get the f--- out of my house." At some point during this interaction, the three state troopers entered the room. At his deposition, Pershell identified the state troopers as Troopers "A", "B", and "C". He referred to Officers Martin and Jones by name. According to Pershell, he asked why he was under arrest and a state trooper responded, "Resisting arrest." One of the troopers then said "Go," and, according to Pershell, a trooper knocked Pershell's legs out from under him using a "leg sweep." Pershell landed on the ground face-first. Pershell's glasses were "digging into [his] face and they were bent wrong," and he felt a foot between his shoulders pushing him into the ground. He believed that Trooper B's foot was on his back. Pershell asked that his glasses be removed to avoid further damage, and one of the troopers took the glasses off his face and placed them on a nearby desk. He believes that Trooper B removed the glasses because he "felt a slight lift off of the pressure on [his] back" as the glasses were removed. Pershell was unable to see clearly without his glasses. While on the ground, Pershell was handcuffed. He testified that he was lying on the ground and not moving at this time.

Within moments, Pershell felt a "forceful impact" on his left foot and ankle, causing "a searing pain." Immediately after, Pershell felt an impact or "blow" on his left side, in the area above his buttock and near belt-level. Pershell described the force of the blow as being "hit by a Missouri mule." Almost instantaneously, he felt a third blow to the area above his left buttock. As a result of the third blow, Pershell lost consciousness. The next thing Pershell remembers is being dragged or carried from the house to a police car and being placed in the back seat. A video recorded by the dashboard camera of Officer Martin's car shows approximately 20 seconds of footage of officers

removing Pershell from the house. Although officers denied dragging Pershell to the car, the video arguably supports an inference that Pershell's feet were dragged through the snow while officers carried him by the arms down the steps and to a police car. Pershell was transported to jail and was moved from the car into the jail facility in a wheelchair. He remained in the wheelchair during the course of the intake interview and until he was placed in a cell. He states that he was in "extreme pain" while at the jail.

Pershell was bailed out of jail by an acquaintance and taken directly to the emergency room at Lakeland Hospital, where he was examined by a physician. He complained about foot, hip, and back pain, and reported to the medical staff that he had been "assaulted by [a] SWAT team" but that he "[didn't] know what they hit him with." The E.R. physician conducted a visual and tactile examination and ordered a single-view x-ray of Pershell's left hip. The examination and x-ray revealed no fractures. Pershell remained in pain during the weeks following discharge from the E.R., and saw an orthopedic specialist on February 28, 2007. The specialist ordered a full x-ray series of the left hip, which revealed a pelvic fracture. A CT scan was performed on March 1, 2007, which showed "a significant acetabelum fracture with some central displacement as well as quite significant comminution of the posterial wall." Pershell required surgery on his pelvis but had to wait for approximately two years for his bone to heal before the operation could be performed.

Pershell was questioned extensively at his deposition about the actions of each officer during the arrest. Based on the positions of the officers and troopers in the room before Pershell was knocked to the floor, he believed that Trooper C performed the "leg sweep," Trooper B placed his boot on Pershell's back and removed Pershell's glasses, and Officer Martin delivered the blows to

Pershell's left side. However, Pershell freely conceded that he did not actually see any of the officers strike him because he was lying on his stomach without his glasses. Pershell testified that Officer Jones was standing to the side holding the taser the whole time, and so he presumably could not have been responsible for any of the blows. From his position on the ground, Pershell could see the boots of Trooper A, so he concluded that Trooper A did not strike him. According to Pershell, Trooper C was located on the right side of Pershell's body, while Martin was at Pershell's left rear. From this placement, Pershell deduced that Martin was likely responsible for the blows.

The officers contested Pershell's version of events. In deposition testimony, each of them denied striking or kicking Pershell and denied seeing any other officer do so. The officers also denied that Pershell's feet were intentionally swept from under him. Officer Jones testified that the three troopers assisted Officer Martin in taking Pershell to the floor and handcuffing him but later equivocated about what he saw. Trooper Miazga stated that he held Pershell's feet once Pershell was on the ground while Officer Martin applied handcuffs. Officer Martin testified that he believed that he lost his balance while attempting to handcuff Pershell and that, as a result, both men fell to the floor. Trooper Cook testified that he tripped or stumbled and fell shortly after Pershell and Martin fell to the ground but could not recall whether he landed on top of Pershell or not. The officers agreed that the only physically aggressive action taken by Pershell was that he took a "combative stance," "defensive stance," or "ready stance," including possibly clenching his fists, when first confronted in the living room. They conceded that Pershell never struck or swung at the officers, however. Martin also testified that he was on Pershell's right side once they were on the floor, not on his left side as Pershell believed.

Pershell filed suit against Officers Martin and Jones, Troopers Cook, Miazga, and Williams, and Baroda Township and Lake Township pursuant to 42 U.S.C. § 1983. He alleged excessive use of force by the individual officers in taking him to the ground and striking him and an unconstitutional policy or practice causing the excessive force by the municipal defendants. He also brought state-law claims for assault and battery and gross negligence against the individual officers. Following discovery, defendants moved for summary judgment and qualified immunity. The court granted summary judgment to Baroda Township and Lake Township on the basis that there was no genuine issue of material fact regarding whether the municipal defendants had a policy or practice that led to violation of Pershell's rights. The court granted summary judgment to all defendants on the gross negligence claim and granted summary judgment to Jones on the excessive-force and state-law claims on the basis that, according to Pershell's own version of the facts, Jones did not make physical contact with Pershell. The court denied qualified immunity to the remaining officers in an order dated March 15, 2010, from which they appealed.

## II

Although a district court's denial of summary judgment is not normally a proper subject of interlocutory appeal, orders denying qualified immunity are immediately appealable under the collateral-order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 525-27 (1985); *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). Our jurisdiction over qualified-immunity appeals is narrow, however: "This Court may exercise jurisdiction 'only to the extent that a summary judgment order denies qualified immunity based on a pure issue of law.'" *Harrison*, 539 F.3d at 517 (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006)). Thus, "the defendant must be prepared to

6

overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." *Id.* (quoting *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998)). "[T]o the extent that the denial of qualified immunity is based on a factual dispute, such a denial falls outside of the narrow jurisdiction of this Court." *Id.*

To the extent jurisdiction is proper, this Court reviews denial of summary judgment by a district court, including denial of qualified immunity, de novo. *Hayden v. Green*, 640 F.3d 150, 153 (6th Cir. 2011). In reviewing qualified-immunity claims, we determine: 1) "whether '[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right'"; and 2) whether that right was clearly established at the time of the alleged violation. *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (alterations in original) (citation omitted); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts may address these questions out of sequence. *Pearson v. Callahan*, 129 S. Ct. 808, 821 (2009). A right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Binay*, 601 F.3d at 646-47.

## III

Defendants contend that they should have been granted qualified immunity from suit because the force allegedly used by the officers was not unconstitutionally excessive and, even if there was excessive force, Pershell was unable to identify which particular defendants were responsible for use of force during the arrest.

The Fourth Amendment prohibits officers from using excessive force in the course of making an arrest. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). "To determine whether a constitutional

violation based on excessive force has occurred, this Court applies 'the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight.'" *Binay*, 601 F.3d at 647 (quoting *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007)). Factors relevant to the reasonableness inquiry include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Taking the facts in a light most favorable to Pershell, officers performed a leg sweep, causing Pershell to fall on his face, handcuffed him once he was on the ground, and then struck him three times, causing him to lose consciousness and sustain a hip fracture. The blows to Pershell's body, if intentionally applied, were not objectively reasonable, and therefore constituted a violation of the Fourth Amendment. Once Pershell was on the ground and handcuffed, with an officer's foot on his back holding him down, he posed no danger to the officers. It was also clearly established at the time of the incident that striking a handcuffed and immobilized arrestee is unreasonable conduct. This Circuit has "consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (citing cases). Striking or kicking Pershell after he was completely neutralized — with enough force to fracture his pelvis — was thus clearly unreasonable conduct. *See Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) ("[T]here was simply no governmental interest in continuing to beat Phelps after he had been neutralized, nor could a reasonable officer have thought there was.").

Using a leg sweep to knock Pershell face-first onto the floor was also objectively unreasonable. Aside from telling the officers to "get the f--- out of my house" and possibly balling up his fists as his hands hung by his sides, Pershell did not resist arrest or pose an immediate danger to officers at the time he was knocked to the ground. It is uncontested that Pershell was unarmed when officers arrived at the house to serve the warrant and that he did not swing or strike at the officers. There were five armed officers at the scene, one of them pointing a taser at Pershell and another carrying a rifle. Although some level of caution and perhaps force would have been justified in effecting the arrest, the leg sweep was objectively unreasonable under the circumstances. *See Lawler v. City of Taylor*, 268 F. App'x 384, 386-87 (6th Cir. 2008) (unpublished) (concluding that the defendant officer's "use of force in throwing Lawler to the floor was disproportionate to any threat he faced from Lawler" given that Lawler merely insulted the officer and "raised his left arm slightly"); *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004) (holding that attempting a leg sweep and then shoving plaintiff against a wall was unreasonable force given that plaintiff was complying with the officers' demands). Taking Pershell's version of the facts as true for the purposes of summary judgment, the district court did not err by determining that the excessive-force claim should go to a jury.

Defendants also seek qualified immunity on the basis that Pershell could not definitively state which defendant was responsible for which aspect of the excessive force. For the purposes of § 1983, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay*, 601 F.3d at 650; *see also Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir. 2008) (remarking that district court should have "distinguish[ed] between the actions of [defendant police officers]" instead

of "lump[ing] them together" for purposes of the qualified-immunity analysis in excessive-force

case). "To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer

'(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive

force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Binay*, 601

F.3d at 650 (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). "As a general rule, mere

presence at the scene of [the alleged constitutional violation], without a showing of direct

responsibility for the action, will not subject an officer to liability." *Id.* (quoting *Ghandi v. Police

Dep't of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984)).

The district court determined that there are genuine issues of material fact regarding the

liability of the defendants under the first prong above, their active participation in the use of

excessive force. For the reasons stated by the district court during its March 11, 2010 hearing and

formally adopted by its order of March 15, 2010, we affirm the denial of qualified immunity to

Martin, Cook, Miazga, and Williams. (*See* Tr. of Defs' Mots. for Summ. J. 74-91, R. 71; Order, R.

64.) Although Pershell was unable to see the officers standing above and behind him at the precise

moment of the blows to his body, he has provided significant information about the location and

conduct of the officers based on his own sensory observations. Further, the officers themselves

provide accounts of the incident. These sources will provide the jury with sufficient information to

determine the liability of each individual defendant for the alleged constitutional violation. This case

differs from those in which the plaintiff lacked sufficient information to name responsible defendants

or to offer an informed account of the facts. *See, e.g.*, *Totman v. Louisville Jefferson Cnty. Metro

Gov't*, 391 F. App'x 454, 464-65 (6th Cir. 2010) (unpublished) (granting summary judgment to

defendants where plaintiff sued one named individual defendant and other "unknown" officers for excessive use of force during the booking process following a warrantless arrest on the basis that unnamed officers may have been responsible for the use of force); *Combs v. Wilkinson*, 315 F.3d 548, 557-58 (6th Cir. 2002) (affirming grant of summary judgment to unidentified officer defendants where state-prison-inmate plaintiffs were unable to name defendants because the officers "wore black uniforms, gas masks, and no name badges" during the incident in question); *Thorton v. Spooner*, 872 F.2d 1029, 1989 WL 34026, at *2 (6th Cir. 1989) (unpublished table opinion) (affirming grant of summary judgment to three officers, all of whom were white, where the plaintiff was unable to identify the officer who allegedly used excessive force except to state that he was black).

## IV

Pershell also brings state-law claims for assault and battery against the defendant officers. In Michigan, a law enforcement officer is entitled to immunity if

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
> (c) the acts were discretionary, as opposed to ministerial.

*Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008). The only disputed question here is whether the officers' alleged acts were undertaken in good faith. "The good-faith element of the . . . test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Id.* at 229. A claim for assault and battery in the course of an arrest implicates the question whether the

11

officers' actions were "objectively reasonable under the circumstances." *VanVorous v. Burmeister*, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004).

There are genuine issues of material fact regarding whether the officers acted with malice when they allegedly struck Pershell repeatedly while he was handcuffed and on the floor. Intentionally striking an incapacitated arrestee with enough force to fracture his pelvis supports an inference of bad faith. The same allegations that would support that Defendants acted objectively unreasonably for purposes of the Fourth Amendment analysis would also support a finding that they acted without good faith for state-law immunity purposes. The district court was therefore justified in denying immunity on the state-law claim.

## V

For the foregoing reasons, we **AFFIRM** the denial of qualified immunity to Defendants Martin, Cook, Miazga, and Williams.