RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0125p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

RENEE FAZICA,

> *Plaintiff-Appellee*,

*v.*

No. 18-1457

ZACHARY JORDAN, JOSH TUCKER, CARLOS CORDOVA, and MARK FLETCHER, Oakland County Sheriff's Deputies,

> *Defendants-Appellants*.

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-13563—Sean F. Cox, District Judge.

Argued: January 17, 2019

Decided and Filed: June 10, 2019

Before: MERRITT, GUY, and MOORE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Brandon K. Buck, Peter L. Menna, OAKLAND COUNTY CORPORATION COUNSEL, Pontiac, Michigan, for Appellants. Richard A. Moore, ROMANO LAW, PLLC, Pleasant Ridge, Michigan, for Appellee. **ON BRIEF:** Brandon K. Buck, OAKLAND COUNTY CORPORATION COUNSEL, Pontiac, Michigan, for Appellants. Richard A. Moore, ROMANO LAW, PLLC, Pleasant Ridge, Michigan, for Appellee.

—————————————

**OPINION**

—————————————

KAREN NELSON MOORE, Circuit Judge.   Plaintiff Renee Fazica was arrested for drunk driving and taken to the Bloomfield County Police Department, and then to Oakland County Jail.  Prior to her arrival at Oakland County, the jail was alerted that she was intoxicated, yelling, and spitting.  A Cell Extraction Team of Oakland County Jail officers including Officers Fletcher, Cordova, Tucker, and Jordan met Fazica upon her arrival.  They roughly removed her from the vehicle and immediately applied a spit hood over her head that nearly entirely obscured her vision.  The Cell Extraction Team moved her into the jail, handcuffed and in a bent-over position.  They handled her forcefully and threatened her with a taser.  The entirely male team took Fazica to a room in the jail where she was made to lie on her stomach and was strip searched.  Her pants were physically torn off her; one officer placed his hands on her genitals and another groped her breasts.  Fazica was then made to walk to a cell wearing only her bra and the spit hood.  The spit hood had obscured her vision for much of the incident, largely preventing her from attributing specific acts to specific officers.

Fazica sued under 42 U.S.C. § 1983, alleging that Fletcher, Cordova, Tucker, and Jordan used excessive force against her in violation of her Fourth and Fourteenth Amendment rights.  Defendants moved for summary judgment on qualified-immunity grounds, arguing only that Fazica cannot show each officer's personal involvement in the allegedly unconstitutional acts.  The district court denied their motion.  Because a reasonable jury could find, based on the record evidence, that each Defendant officer either committed or observed and failed to stop the allegedly unconstitutional acts, we **AFFIRM** the district court's denial of summary judgment.

## I. BACKGROUND

On October 16, 2014, a heavily intoxicated Fazica was pulled over by Bloomfield Township police officers on suspicion of drunk driving. R. 16-3 (Fazica Dep. at 21–22) (Page ID #159–60).  After a blood sample was collected at the hospital, Fazica was taken to the Bloomfield Township Police Department. *Id*. at 24, 28 (Page ID #162, 166).  She was upset by

her arrest and detention and vocally expressed her discontent. An officer at the Bloomfield police station informed her that if she did not lie down and go to sleep, she would be transferred to Oakland County Jail. *Id*. at 30 (Page ID #168). Oakland County Jail sometimes receives inmates from other jails for various reasons—it has more cells and its staff is trained to deal with unruly inmates. R. 16-7 (Fletcher Dep. at 11–12) (Page ID #257). A staff member from Bloomfield called Oakland to inform the jail that Fazica would be arriving at Oakland and that she was "intoxicated, yelling and spitting." R. 16-4 (Case Report) (Page ID #226).

Fazica was driven by a Bloomfield Township officer to the Oakland County Jail. R. 16-3 (Fazica Dep. at 30–31) (Page ID #168–69). While she was still in this officer's vehicle, he told her that she "better be good over here because they won't put up with you." *Id*. Upon arriving at the Oakland County Jail, Fazica noticed that four male officers were standing waiting for the vehicle. *Id*. at 32 (Page ID #170). The Bloomfield Township officer exited the vehicle and joined the other four, who were laughing. *Id*. Fazica remained in the back seat, silent and facing forward. *Id*. Suddenly, one of the four Oakland County officers opened the passenger side door in the back and another opened the driver's side door. *Id*. The Oakland County officers put her on the ground, face down and on her stomach. *Id*. at 37 (Page ID #175). They placed a spit mask over her head and face. The mask was white and of a "soft," "thicker" material that went up to the "very top of the bridge of her nose, like sort of close to her eyebrow line" so that she "could see just a tiny, tiny bit out of the top of [her] mask." *Id*. at 38–39 (Page ID #176–77). The mask is designed such that the white opaque portion covers the wearer's mouth to protect officers from being spit on. The top portion is made of a black mesh that is designed to allow the person wearing it to see out. R. 16-7 (Fletcher Dep. at 16) (Page ID #258). However, "if it were not pulled all the way down" or "[i]f the liner is pulled up too high," it is possible that the person wearing the mask would not be able to see. R. 19-6 (Tucker Dep. at 18) (Page ID #426).

One officer pulled Fazica's arms up and back behind her; Fazica believes that he did so to change her handcuffs out of those used by the Bloomfield Township police into new ones. R. 16-3 (Fazica Dep. at 33) (Page ID #171). She told the officers that "it was hurting me really bad because it was my bad arm." *Id*. at 37 (Page ID #175). She was told to shut up. *Id*. She heard the Bloomfield Township officer get back in his car to leave. *Id*.

Fazica was then picked up and stood on her feet.  The officers walked her up a stair and through a door into a hallway.  *Id*. at 40 (Page ID #178).  Once she was up the stair, the officers bent her over so that her face was toward the floor.  *Id*. at 41–42 (Page ID #179–80).  At that point, one officer put his hands on her neck.  He held her neck with four fingers of each hand on the back of her neck and his thumbs in the front of her neck, with the thumbs a couple of inches away from each other.  *Id*. at 44 (Page ID #182).  Fazica cried and told the officers that they were hurting her and that she could not breathe, but the officer pushed his fingers harder on her neck.  *Id*.  One officer stood by her side and told her repeatedly:  "follow my voice or I'll tase you."  *Id*. at 42 (Page ID #180).  Fazica maintains that she could not see while the officers transported her through the building in this manner.  She believes that she was taken to "a room because [she] thought they closed the door on it."  *Id*. at 45 (Page ID #183).

Fazica had been wearing the jumpsuit that she had been issued at the Bloomfield Township jail with the arms tied around her waist and no underpants.  She also wore a bra and shirt.  *Id*. at 43, 46 (Page ID #181, 184).  Once the officers brought her into the room, they placed her face down on her stomach in a prone position on the floor, still wearing the spit hood.  *Id*. at 47 (Page ID #185).  She was "freaking out" and asking "what are you guys doing," but she was not physically resisting.  *Id*. at 45–46 (Page ID #183–84).  One officer "pushed her face down" and an officer "said everyone gets stripped search [sic], just shut up."  *Id*. at 45 (Page ID #183).  Fazica does not recall how the officers got her shirt off.  An officer ripped her pants off from behind—literally tearing them apart.  *Id*. at 46 (Page ID #184).  One officer then "had [her] butt cheeks spread apart and there was [sic] hands like he was feeling for something."  *Id*.  He placed his hands on her genitals.  *Id*. at 71 (Page ID #209).  Another officer put his hands up the front of Fazica's bra and felt her nipples; Fazica felt his hands shaking as he did it.  The officer who felt Fazica's breasts "asked what the clips were, and the gentleman behind [her] said they were the clips to [her] bra, don't worry about it."  *Id*. at 47 (Page ID #185).  The same officer who had his hand on her breasts called her a bitch and one officer "kind of slap punched [her] when [she] was in the strip search room because he was mad because [she] was hysterical."  *Id.* at 48, 52 (Page ID #186, 190).  The officers did not remove her bra.  *Id*. at 47 (Page ID #185).  She could not hear any female staff in the room and believes that no other females were present during the strip

search.  *Id*.  Fazica knew that the officers who were strip searching her and who were present in the room were male because of their voices and their hands.  *Id*. at 48 (Page ID #186).

After the strip search, the officers walked her to a cell wearing nothing more than her bra and the spit hood.  *Id*. at 49 (Page ID #187).  They "put [her] onto the ground, they threw a pair of scrubs into the corner of the [cell]" and then "they ripped the mask off and the door shut."  *Id*.  When the spit hood was removed, Fazica saw "a couple males walk away laughing."  *Id*.  She testified that it was around 10:00 P.M. by that point.  *Id*. at 50 (Page ID #188).  Her nose was bleeding, and she got dressed.  *Id*.  She was told that she would see a nurse, but no nurse ever arrived.  *Id*.  Fazica was booked and photographed.  *Id*.  She was returned to her cell.  Someone asked her over the speaker in her cell whether she had come to the jail naked.  *Id*. at 51 (Page ID #189).  Someone at the jail gave her clothes from Goodwill and she was released on the morning of October 17, 2014.  *Id*.  She was bruised from head to toe after the incident.  *Id*.  The day after she was released, she went to the hospital with her husband.  *Id*. at 55 (Page ID #193).  They did not give her medicine, but "gave [her] a list of what to do, soaking."  *Id*.

The Oakland County Sheriff's Office Case Report for the incident denotes both the "Report Date/Time" and "Occurrence Date/Time as October 16, 2014 at 8:57 PM.  R. 16-4 (Case Report) (Page ID #223).  However, the "Narrative" portion of the Case Report appears to have been written on November 12, 2014 at 3:46 PM.  The Case Report was created by Officer Dwayne Rodriguez.  Under "People" it lists a nurse named Thorpe (with no first name), Renee Fazica, and police officers Carlos Cordova, Dwayne Rodriguez, Josh Tucker, Mark Fletcher, Zachary Jordan, and Paul Nicotri.  The "Narrative" portion chronicles the incident and relates that the Cell Extraction Team included five, rather than four, members:

> Booking received a call that Bloomfield Township was bringing in a new arrest, Inmate Fazica . . . and that she is intoxicated, yelling and spitting. . . . Sgt. Nicotri was notified.  Supervisor Jordan was lead taser, Dep. Tucker was lead, Dep. Cordova and [Rodriguez] were wings and Supervisor Fletcher was four man [sic]. . . . Inmate Fazica was yelling as the door to the patrol car was opened.  Dep. Tucker gained control of Inmate Fazica and with the assistance of Dep. Cordova and myself she was removed from the car.  Dep. Tucker gained control of her head, Dep. Cordova and [Rodriguez] took control of her arms.  A spit hood was then placed over her head.  A pat down was then conducted for the safety and security of the Main Jail.  Inmate Fazica was then escorted to the Annex and taken

into Cell 1E-4. Inmate was told to lay down on the floor and she complied. Inmate was then searched. The handcuffs were then removed. Inmate Fazica was ordered to stay on the floor until the cell door was closed. All team members then left the cell without further incident. Nurse Thorpe then medically cleared inmate Fazica of any injuries. Event entered into IMACS.[1]

*Id*. (Page ID #226). Although Rodriguez was a member of the Cell Extraction Team that received Fazica that day, he was not named as a Defendant in the complaint. Nicotri, a Sergeant on duty who was not a member of the Cell Extraction Team was named as a Defendant.

All named Defendants claim to have no memory whatsoever of the incident involving Fazica. R. 16-6 (Cordova Dep. at 9–10) (Page ID #247); R. 19-4 (Jordan Dep. at 8) (Page ID #399); R. 16-7 (Fletcher Dep. at 10–11) (Page ID #257); R. 19-6 (Tucker Dep. at 6–7) (Page ID #423). They were all deposed and testified in generalities about the practices of the Cell Extraction Team and their work at the jail. They testified that there are female officers who are trained to be members of Cell Extraction Teams, but that the gender of the inmate does not impact the gender composition of the Cell Extraction Team assigned to receive the inmate. R. 16-6 (Cordova Dep. at 14) (Page ID #248). Defendants testified that they do not use a chokehold during the extraction. *Id*. at 18 (Page ID #249). However, they do use "head control" using "pressure points," most commonly "behind the ear" and "underneath the eye." R. 19-4 (Jordan Dep. at 13–14) (Page ID #401). They also "bend the prisoner over so that their face is facing the ground." *Id*. at 14 (Page ID #401).

Any person who comes to the Oakland County Jail after having been arrested for a felony is strip searched. *Id*. at 10 (Page ID #400). Female inmates are taken to a location in the jail called the Annex when they first arrive. R. 16-6 (Cordova Dep. at 13–14) (Page ID #248). The officers testified that in a strip search, they prefer to let the inmate remove her own clothing, but that if the inmate is combative, members of the Cell Extraction Team will physically remove the inmate's clothing. They testified that the strip search is normally performed with the inmate standing. If the inmate is combative, however, it can be performed with the inmate lying on the ground in a prone position. R. 16-7 (Fletcher Dep. at 18) (Page ID #259). However, all

---

[1]IMACS is "the computer system that [the officers] use in order to keep track of all [their] inmates." R. 16-7 (Fletcher Dep. at 21) (Page ID #260).

Defendant officers testified that once the inmate's clothing has been removed, the inspection is merely visual and does not involve physical probing of the inmate. R. 19-4 (Jordan Dep. at 11) (Page ID #400); R. 16-6 (Cordova Dep. at 16) (Page ID #248); R. 16-7 (Fletcher Dep. at 18) (Page ID #259). Defendant Tucker testified that if a strip search is done while an inmate is in the prone position on the floor, the officers will "roll them over on one side, back to their stomach, roll them over on the other side to make sure there's no weapons or contraband." R. 19-6 (Tucker Dep. at 11–12) (Page ID #424). Some officers testified that all-male Cell Extraction Teams are permitted to perform strip searches on female inmates. R. 16-7 (Fletcher Dep. at 25, 28) (Page ID #261). Only one Defendant, Jordan, testified that "[i]f we don't have a female team member available we'll have one of our non team female deputies assist us in doing it. . . . It's always done by the same sex." R. 19-4 (Jordan Dep. at 10–11) (Page ID #400). Defendants also testified that if the strip search is performed in the Annex prior to the inmate being taken to her cell, she is given her clothes after the strip search and not required to walk naked to her cell. R. 16-6 (Cordova Dep. at 16) (Page ID #248).

Fazica filed her first Complaint on October 5, 2016 and an Amended Complaint on January 30, 2017. R. 7 (First Am. Compl.) (Page ID #46). The complaints named Nicotri, Fletcher, Cordova, Tucker, and Jordan as Defendants but did not name Rodriguez. Fazica brought three claims: (1) use of excessive force in violation of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983; (2) gross negligence, willful and wanton misconduct, assault, battery, and intentional infliction of emotional distress; and (3) deprivation of liberty without due process of law, pursuant to 42 U.S.C. § 1983. *Id.* Defendants moved for judgment on the pleadings or in the alternative summary judgment on November 9, 2017, raising the narrow argument that Plaintiff had failed to make specific allegations against particular Defendants. R. 16 (Mot. for Summ. J. at 1, 15–19) (Page ID #106, 130–35). On March 15, 2018, the district court held a hearing on the motion. R. 36 (Mot. Hr'g Tr.) (Page ID #635). On March 21, 2018 the district court issued its order granting summary judgment with respect to Defendant Nicotri and denying summary judgment with respect to the other four named Defendants: Jordan, Tucker, Cordova, and Fletcher, "because a genuine issue of material fact exists as to whether each defendant was present and personally involved in any violation of

Plaintiff's rights."  R. 28 (Op. and Order at 1) (Page ID #600).  On April 18, 2018, Defendants filed their timely notice of appeal.  R. 32 (Notice of Appeal) (Page ID #629).

## II.  DISCUSSION

### A.  Jurisdiction

We have jurisdiction in this interlocutory appeal based on the district court's denial of summary judgment under 28 U.S.C. § 1291.  "[A]ny summary judgment order denying qualified immunity is immediately appealable to the extent it is 'based on a pure issue of law.'"  *Pollard v. City of Columbus*, 780 F.3d 395, 401 (6th Cir. 2015) (quoting *Leary v. Livingston County*, 528 F.3d 438, 447–48 (6th Cir. 2008)).  For the purposes of this appeal, Defendants concede any factual disputes and adopt the version of events put forth by Fazica.  Def. Br. at vi; *Moldowan v. City of Warren*, 578 F.3d 351, 370 (6th Cir. 2009) (quoting *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (noting that if "the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal")).  This leaves us with a question of pure law over which we have jurisdiction.

### B.  Standard of Review

We review de novo the district court's denial of qualified immunity on summary judgment.  *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996); *see also Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010).  The relevant question at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### C.  Individual Liability

Normally, we review a defendant's assertion of qualified immunity in two steps: (1) determining whether the defendant violated a constitutional right and (2) deciding whether that right was clearly established at the time of the incident.  *See Shreve v. Franklin County*, 743 F.3d 126, 134 (6th Cir. 2014).  Here, however, Defendants challenge the district court's denial of

summary judgment on one narrow ground, and we limit our review to that question:  whether Fazica has sufficiently offered proof of each individual Defendant's alleged constitutional violations such that a reasonable jury could find him personally involved.  *See* Appellant Br. at 8. We therefore address only the question of proof of Defendants' individual liability for acts that Fazica alleges amount to unconstitutional excessive force; we do not delve into whether the physical contact was in fact excessive force or whether its unconstitutionality was clearly established at the time of the incident.

For Fazica's claim to survive summary judgment, she must point to sufficient record evidence to create a "disputed issue of material fact as to whether [each individual officer] was personally involved in the conduct that violated the [plaintiff's constitutional rights]." *Binay*, 601 F.3d at 651.  This is because "[e]ach defendant's liability must be assessed individually based on his own actions." *Id.* at 650.  "As a general rule, mere presence at the scene of a [constitutional violation], without a showing of direct responsibility for the action, will not subject an officer to liability." *Ghandi v. Police Dep't of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984).

Having personal involvement in or direct responsibility for the violation of Plaintiff's constitutional rights does not, however, necessarily mean that each Defendant officer directly placed hands on her.  There are several ways that a defendant officer may violate a pretrial detainee's constitutional rights.  A plaintiff who claims that a defendant used excessive force must show that the officer "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Binay,* 601 F.3d at 650 (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).  "[A] police officer who *fails* to act to prevent the use of excessive force may still be held liable where '(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008) (quoting *Turner*, 119 F.3d at 429).

Defendants argue that because Fazica cannot clearly attribute particular uses of force to particular Defendants, she cannot prove that any particular Defendant's conduct violated her

constitutional rights. Def. Br. at 19–20. For example, they argue that she cannot prove whether it was Defendant Officer Fletcher, Cordova, Tucker, or Jordan who was the one to twist her arm behind her back, rip her pants off, touch her genitals, etc., and that therefore she must lose at summary judgment. We reject Defendants' argument and conclude that a reasonable jury could find that each of the named Defendants violated Fazica's clearly established constitutional rights either by directly using excessive force against her or by observing others doing so and failing to act.

Several of our cases address defendants' assertions of qualified immunity in instances where the plaintiffs had difficulty identifying the perpetrator of unconstitutional acts. In *Binay v. Bettendorf*, five or six masked officers executed a search warrant on the plaintiffs' home. 601 F.3d at 643–44. The plaintiffs claimed that the officers used excessive force in executing the warrant by handcuffing them and holding them at gunpoint while interrogating them. *Id*. at 644. Defendant Officer Bettendorf argued that he should be granted summary judgment because "he had no personal involvement in the alleged use of excessive force beyond mere presence at the scene." 601 F.3d at 651. However, because there was evidence that he "was in the room with Plaintiffs during the interrogation and at the time Plaintiffs were handcuffed" and he testified that he had "carr[ied] a pistol during the raid" we concluded that there was "a question of fact as to whether he was *one of the officers* pointing a gun at or securing Plaintiffs during some part of the raid." *Id*. (emphasis added). After cataloging the evidence that linked this defendant to the constitutionally violative conduct, we noted: "Furthermore, the fact that Defendants wore masks during the raid made it exceedingly difficult for Plaintiffs to identify with precision which officers engaged in which conduct." *Id*. We affirmed the district court's determination that the plaintiffs had marshalled enough evidence to preclude summary judgment on Officer Bettendorf's individual involvement.

In *Burley v. Gagacki* ("*Burley I*"), 729 F.3d 610 (6th Cir. 2013), the plaintiffs alleged that state, local, and federal defendants were members of a group of officers that used excessive force when executing a search warrant of the plaintiffs' home. *Id.* at 613. The officers who conducted the raid wore masks and refused to reveal their names. *Id*. at 614. The federal defendants stalled during discovery and waited until the limitations period had run before asserting "that they did

not participate in the raid of plaintiffs' home but were instead executing a search warrant" nearby. *Id.* at 615. The district court granted summary judgment to the state and local defendants who the record showed "were present at the scene" but "were *not* part of the entry team and their role was limited to perimeter security." *Id.* at 619–20. The case against the federal officers went to trial. One plaintiff testified that she recognized the voice of one of the federal officers as belonging to an officer who had raided her home. *Id.* at 616–17. After the close of the plaintiffs' case the district court granted judgment as a matter of law to the federal defendants. *Id.* at 617. We affirmed the district court's grant of summary judgment to the state and local defendants "[b]ecause no evidence place[d] the state and local defendants inside plaintiffs' home at the appropriate time to witness or respond to any unconstitutional conduct that may have occurred." *Id.* at 620. We reversed the district court's grant of summary judgment to the federal defendants, however, concluding that enough evidence existed such that a jury should have been allowed to decide whether the federal defendants were personally involved in the raid. *Id.* at 622. We remarked that where a jury could find that one named defendant "was part of the entry team" that used excessive force based on the plaintiff's recognizing his voice from the incident, and that defendant "and the other federal defendants worked as a team at all times relevant to this case, a jury could reasonably infer that the other federal defendants also (1) were personally involved in the alleged use of excessive force or (2) failed to intervene to prevent it." *Id.* The state and local defendants' "mere presence at the scene" was insufficient for the plaintiffs' claim against them to survive summary judgment, but the federal defendants' possible participation in a small group that engaged with the victim in an arguably unconstitutional manner sufficed.[2] *See id.* at 620 (quoting *Ghandi*, 747 F.2d at 352).

In *Pershell v. Cook*, we again affirmed the district court's denial of summary judgment on grounds of qualified immunity even though plaintiff was unable decisively to identify which member of a small group of defendants had struck him. 430 F. App'x 410, 413 (6th Cir. 2011).

---

[2]*Burley I* was an appeal from a district court's post-proof judgment as a matter of law and *Burley II* was an appeal from the trial jury's verdict. *Burley v. Gagacki (Burley II)*, 834 F.3d 606, 614 (6th Cir. 2016) ("Here, plaintiffs' complaint advanced beyond [the motion to dismiss] stage, through discovery and summary judgment, and to trial."). Fazica is merely arguing that she should be able to present her claims to a jury in the first place. Procedurally, Fazica's claim is at a stage beyond which the *Burley* plaintiffs had already long passed when the *Burley* appellate decisions were issued.

During the relevant incident, Pershell had been knocked to his stomach on the floor with his glasses removed, unable to see which of the five officers present struck him as he lay there. *Id.* He had some sense of where the various officers had been located prior to the removal of his glasses. *Id.* at 416 ("Although Pershell was unable to see the officers standing above and behind him at the precise moment of the blows to his body, he has provided significant information about the location and conduct of the officers based on his own sensory observations."). Pershell did not identify three of the five the officers by name—his deposition testimony referred to them only as "Troopers 'A', 'B', and 'C'." *Id.* at 412. The defendants' depositions provided indefinite, sometimes conflicting accounts of their locations and roles in the use of force against him. *Id.* at 413–16. We concluded that "[t]hese sources will provide the jury with sufficient information to determine the liability of each individual defendant for the alleged constitutional violation." *Id.* at 416. In doing so, we contrasted Pershell's case with "those in which the plaintiff lacked sufficient information to name responsible defendants or to offer an informed account of the facts," in which granting summary judgment to the defendants would be appropriate. *Id.* (citing *Totman v. Louisville Jefferson Cty. Metro Gov't*, 391 F. App'x 454, 464–65 (6th Cir. 2010) (affirming grant of summary judgment where plaintiff could not identify several unknown officers who could have been responsible for the beating in the booking area and where the named defendant had not been present for the beating in the cell); *Combs v. Wilkinson*, 315 F.3d 548, 557–58 (6th Cir. 2002) (affirming grant of summary judgment on plaintiffs' claims against unidentified and totally unknown officers); *Thornton v. Spooner*, 872 F.2d 1029, 1989 WL 34026, at *2 (6th Cir. 1989) (unpublished table opinion) (affirming grant of summary judgment where plaintiff's testimony either exculpated the named defendants or was entirely speculative and the plaintiff did not allege a failure to intervene).

*Binay*, *Burley*, and *Pershell* therefore stand for the proposition that where a plaintiff who was unable to identify clearly which officers committed specific acts during the incident produces evidence that places an individual defendant in a small group of officers that committed allegedly unconstitutional acts within each other's presence, the plaintiff's claim against that defendant may survive summary judgment. *See Burley I*, 729 F.3d at 622 (holding that because evidence identified one defendant as a member of the team conducting the raid and the other named defendants "worked as a team at all times relevant to this case, a jury could reasonably

infer that [they] (1) were personally involved in the alleged use of excessive force or (2) failed to intervene to prevent it"). Such a conclusion does not, as Defendants claim, "gut[] qualified immunity because it allows any plaintiff to proceed past summary judgment in the complete absence of <u>any</u> evidence that a particular defendant committed a specific constitutional violation." Def. Br. at 18. First, it applies only to a limited set of plaintiffs: those who can identify the small team of officers who potentially used excessive force against the plaintiff in each other's presence. Second, it *does* require evidence that each particular defendant committed a specific constitutional violation. It acknowledges, however, that specific constitutional violations can be committed not only by an officer personally applying excessive force, but also by an officer witnessing excessive force and neglecting his duty to intervene.

Defendants argue that the key fact driving the denials of summary judgment to defendants in *Binay* and *Burley* was the officers' intentional acts to conceal their identities so that their victims could not identify them as the specific violators of their rights. We reject this interpretation of our precedent. The key question in *Burley* and *Binay*, as in all cases on summary judgment, was whether the plaintiff had put forth evidence such that a reasonable jury could find each defendant liable. Although these cases express concern about the fact that the defendants intentionally obscured their faces, that factor is not dispositive in their analyses. *See, e.g., Binay*, 601 F.3d at 651 ("*Furthermore*, the fact that Defendants wore masks during the raid made it exceedingly difficult for Plaintiffs to identify with precision which officers engaged in which conduct.") (emphasis added). In *Burley I*, the federal officers' intentional concealment of their identities was an aggravating factor that reinforced the court's determination that the plaintiffs' claim should survive summary judgment, not an element *necessary* to reach that conclusion. In that case we noted only after declaring that there existed a genuine issue of material fact as to the officers' individual involvement that "[a]dditionally, we are not inclined to shield the federal defendants from liability as a reward for their unethical refusal to identify themselves by name and badge number." *Burley I*, 729 F.3d at 622; *see also Greer v. City of Highland Park*, 884 F.3d 310 (6th Cir. 2018) (affirming the denial of judgment on the pleadings where the defendants had worn ski masks while searching the plaintiffs' home).

The *Burley* and *Binay* courts were not presented with a situation in which the plaintiff was unable to distinguish between the officers because of actions the officers took that obscured the victim's vision that may not have been specifically intended to hide the officers' identities.**[3]** We reject the invitation to overread and extrapolate those cases' comments to create a universal intent-to-conceal requirement. Furthermore, in *Pershell*, arguably the case most similar to Fazica's, the plaintiff did not allege that the defendants had intended to conceal who struck the blow against his back as he lay on his stomach without his glasses. *Pershell*, 430 F. App'x at 413. Yet we still affirmed the district court's denial of summary judgment on the individual liability question. *Id*. at 416.

Defendants argue that the only reason that the court might deny qualified immunity in a case in which the plaintiff is not able conclusively to identify which officer committed which potentially unconstitutional act is "to avoid rewarding defendants who intentionally conceal their identities." Def. Br. at 11. Certainly, disincentivizing officers from obscuring their identities so that they may use excessive force without consequences is a valid concern. *See Burley I*, 729 F.3d at 622. However, it is not the only concern. Plaintiffs who are unable to pinpoint precisely which named defendant did what, even where the defendants did not intentionally conceal their identities, still have an interest in the vindication of their constitutional rights. Section 1983 claims do not only incentivize officers' good behavior; they also compensate and achieve justice for victims. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396 (1971) ("[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." (citation omitted)). The victim can suffer the same unconstitutionally excessive force whether the officer intentionally hid his face or the spit hood

---

**[3]**We note that simply because the spit hood used was designed with a mesh section over the eyes to allow the wearer to see out does not mean that it could never be intentionally employed to obscure the wearer's vision. Defendants admitted that the hood could obscure the wearer's vision "[if] the liner is pulled up too high." R. 22-6 (Tucker Dep. at 18) (Page ID #578). Fazica's claim alleges that the officers used excessive force against her that was also against the jail's policies, acts an officer would not want to be caught committing. A jury could reasonably infer that the officers intentionally misapplied the spit hood to cover Fazica's eyes and thereby commit these acts with impunity. We emphasize, however, that because we disagree with Defendants' argument that an intent to conceal is necessary to proceed past summary judgment on this claim, the fact that we believe that a jury could indeed find such an intent present is not critical to our analysis.

accidentally rode up to cover the victim's eyes.  Finally, whether or not the officers intended to conceal their identities, the victim must ultimately carry her burden to prove each defendant's individual liability by a preponderance of the evidence at trial.

Fazica, like the plaintiffs in *Binay*, *Burley*, and *Pershell*, has put forth record evidence such that a reasonable jury could conclude that each of the named Defendants either violated her constitutional rights or observed his colleagues violating her constitutional rights and failed to intercede.  First, Fazica's own testimony, the Case Report, and the officers' testimony could combine to convince a jury that specific Defendants committed specific acts that constituted excessive force.  Second, the small size of the team and its interdependent work in close quarters could enable a jury to conclude that each Defendant had observed a colleague committing unconstitutional acts and failed to intervene, even if he had not himself used excessive force against Fazica.

Fazica herself offered some distinguishing descriptions that could aid a jury in determining which Defendant committed which acts.  Fazica testified about the relative heights of some of the officers.  She testified that one of the men who opened the back doors of the police car was "tall.  He might have been blondish brown hair, but he seemed bigger."  R. 16-3 (Fazica Dep. at 35) (Page ID #173).  She recalled that two of the officers each had a Taser—one had a yellow one and the other had a red one, "[o]ne was long and one was short."  *Id*.  The man who had hold of her neck and head when she was walked into the jail "was a thin guy," "young," and "was shaking"—she testified that she believes that he is the same officer who reached into her bra.  *Id*. at 41–42, 48 (Page ID #179–80, 186).  She testified that all of the officers involved were male and she was fairly certain that all were white.  *Id*. at 36 (Page ID #174).  One of the officers who she saw walking away laughing when the mask was removed from her head after she had been placed in the cell had dark hair.  *Id*. at 50 (Page ID #188).  Finally, at one point during her deposition, Fazica testified that "[i]f [she] could see [the officers] [she] would know [who they were]."  *Id*. at 60 (Page ID #198).

The Case Report could also serve as key evidence in convincing a jury which officer was responsible for which action.  It identifies Tucker as lead, Cordova as wing, Jordan as lead taser, and Fletcher as foreman.  The officers' deposition testimony established the normal duties and

physical positions in the formation that correspond to each of these unique roles on the Cell Extraction Team.  A jury could cross-reference Fazica's testimony about what was done to her with the assigned tasks that correspond to each role on the Cell Extraction Team, and then with the individual Defendant that the Case Report states held each role on the day in question.  The Case Report also identifies the physical locations of several of the Defendants during their interaction with Fazica.  For example, it states that Defendants Tucker and Cordova were involved in initially retrieving Fazica from the police car—Tucker controlled her head and Cordova took control of her arms.  This could aid a jury in matching officers' identities to Fazica's accounting of their actions.

The small size of the Cell Extraction Team and its members' interdependent work in close quarters could allow a jury reasonably to infer that all of the defendants "(1) [were] personally involved in the alleged use of excessive force or (2) failed to intervene to prevent it." *Burley I*, 729 F.3d at 622.  First, four of the five members of the Cell Extraction Team are named Defendants.  The Case Report states that all Cell Extraction Team members were present beginning when they took Fazica from the police car until after the strip search concluded.  Second, the Cell Extraction Team members worked closely with one another; each had an assigned role that brought them in close contact with the inmate they were assigned to manage, and close physical proximity with one another.  Third, at least two different officers physically groped Fazica during the strip search—one touching her breasts and another touching her genitals—and more than one officer hurt her by either choking her or forcing her arms back behind her.  Her testimony that multiple Defendants committed potential constitutional violations would enable a jury reasonably to conclude that each Defendant either committed the acts himself or observed his colleagues committing them.  Fourth, the obviousness of some of the acts Fazica recounts support the conclusion that the Defendants noticed the conduct and failed to intervene to stop it.  Fazica stated that her pants were physically torn off her body before her genitals and breasts were groped, and the officers testified that strip searches do not usually involve physical contact with the inmate's body.  A jury could reasonably conclude that when an officer commits such acts, his colleagues are likely to notice.

Defendants place significant weight on Fazica's failure to name Dwayne Rodriguez, a member of the five-man team that received Fazica, as a defendant in this case, arguing that it gives rise to "a real and present risk that a jury will assign blame to the wrong person."[4]  *See* Def. Br. at 8, 17, 20.  The defendants sound a false alarm.  First, Fazica testified that more than one of the members of the Cell Extraction Team used excessive force against her.  Therefore, each discrete incidence of allegedly unconstitutional contact could not have been committed by Rodriguez.  Second, a Defendant may be liable if he observes his colleague's unconstitutional act, has an opportunity to intervene, but fails to do so.  *See Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008).  Accordingly, even if Rodriguez himself *had* committed every act of excessive force against Fazica, a jury could still find the named Defendants liable.[5]

Finally, Defendants argue that Fazica has attempted to shift the burden to each Defendant to prove that he did *not* violate her constitutional rights, when in fact the burden is rightfully hers to prove that he did.  We reject this argument as well.  The burden of proof at trial will still rest with Fazica.  She must show that each individual Defendant either exerted excessive force on her or observed his coworker do so and, given the opportunity, failed to intervene.  We merely conclude that the record evidence in this case could support a reasonable jury making such a finding.

### III.  CONCLUSION

For the reasons set forth above, the district court's denial of Defendants' motion for summary judgment is **AFFIRMED**.

---

[4]Fazica does not address her failure to name Rodriguez as a defendant, but it was likely the result of confusion based on the Case Report.  The complaint instead named Sergeant Paul Nicotri, who was mentioned in the Case Report but was not in fact a member of the Cell Extraction Team in question.  R. 16-4 (Case Report) (Page ID #226); R. 16-8 (Nicotri Dep. at 8–9) (Page ID #270–71).

[5]Defendants argue that the constitutional violations did not last long enough such that an officer would have had the time to realize that they were happening and intervene.  Def. Br. at 21.  However, viewing the facts in the light most favorable to Fazica, there is a genuine question for the jury of whether there was sufficient opportunity for the officers to realize that excessive force was being used and to intervene.  The jury could therefore find for Fazica on a theory that the Defendant officers violated their "duty of protection against the use of excessive force."  *Turner*, 119 F.3d at 429.