NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0449n.06

Case No. 23-3860

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Oct 03, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| CORVIN ENGLISH, | ) | |
|       Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| | ) | |
| CHIEF GEORGE KRAL; LIEUTENANT BRENT SCOBLE; OFFICER JEREMY THOMAS; DETECTIVE SCOTT E. POSKARBIEWICZ; DETECTIVE JAMES SUTPHIN; OFFICER ROBERT ROGALSKI; OFFICER MATTHEW GANKOSKY, in their official and individual capacities, | ) | O P I N I O N |
|       Defendants-Appellees. | ) | |

Before: COLE, WHITE, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. Corvin English says the Toledo Police Department (TPD) engaged in a years-long campaign of harassment against him at his place of business. This lawsuit focuses on two arrests that he alleges were part of that effort. In November 2017, officers arrested English at his music studio without a warrant. The officers initially entered the studio to arrest English for a nuisance violation, but ultimately charged him with assault on a police officer, resisting arrest, obstructing official business, and chronic nuisance. The charges did not prevail; a Lucas County jury acquitted English on all counts. And after his acquittal, English filed this lawsuit against the City of Toledo, Police Chief George Kral, and several named officers, alleging, as relevant on appeal, unlawful arrest, excessive force, and related state-law claims.

While the case was still pending, TPD again arrested English in January 2020. English amended his complaint to add a claim of excessive force for the second arrest too. Defendants moved for summary judgment, which the district court granted based on qualified immunity. English appeals. We AFFIRM IN PART, REVERSE IN PART and REMAND for further proceedings.

**I.**

English, a local music artist and entertainer, operated "Money Getta Records," a registered music business and studio in Toledo, Ohio. Though the business is registered as a record label TPD viewed the studio as an "after-hours bar" that often drew complaints about noise, parking violations, and other disturbances. (*Trial Tr.*, R. 29-1, PageID 240, 269).

The events at the center of this case transpired on November 24, 2017, around 3:00 a.m., when TPD officers arrived at English's studio. No one had summoned law enforcement to the location on that day, but the officers had been conducting "targeted enforcement" at the studio "because of the problems occurring there." (*Id.* at PageID 323). Defendant Officers say that, upon arrival, they observed multiple parking violations and heard loud music. These observations led to a decision to arrest English for "chronic nuisance." But during the officers' warrantless entry into the studio, the incident escalated. When all was said and done, English was charged with assaulting a police officer, resisting arrest, obstructing official business, and chronic nuisance. English stood trial in state court where several officers testified about the facts leading up to and culminating in his arrest.

According to that testimony, the officers waited outside the studio for English to come out. Officer Matthew Gankosky stated that the music was loud enough to feel the bass vibrations "on your chest . . . from outside the building." (*Id.* at PageID 155). And Lieutenant Brent Scoble

described the music as "obscenely loud." (*Id*. at PageID 241). As officers issued parking citations for cars parked outside the studio, English opened the front door several times, yelled profanities at them and called them names, then returned inside. According to the officers, each time English opened the door, they instructed him to "turn the music down or [he was] going to be arrested." (*Id.* at PageID 242). Finally, the last time English opened the door, several officers "followed him in [the building] in hot pursuit." (*Id.* at PageID 244). Gankosky testified that when he tried to grab English, English slammed the door shut while Gankosky's hand was "between the door and the doorjamb." (*Id.* at PageID 161).

Scoble testified that once officers reached English inside the studio, where there were about thirty to forty people present, he informed English that he was under arrest. Scoble then used a "joint manipulation" technique by grabbing English's middle finger to get him to the ground. (*Id.* at PageID 244). According to Scoble, though English was face down on the ground, he was resisting. Scoble described English as tucking his arms underneath his body. Scoble claimed that this positioning required him to maneuver English's arms out from under his body to handcuff him.

English's account differs. In an affidavit filed with his response to Defendants' motion for summary judgment, English states that he did not know he was under arrest until officers tackled him. He says that before that point, officers had only threatened him with future arrest during their exchanges at the door. And he went back inside to avoid escalation. Then, after his last retreat, TPD officers followed in behind him, tackled him, grabbed him, and forced his face to the floor so forcefully that he felt his skull being crushed. He described one officer on each side, pushing his arms up and behind his back while he lay on the ground. This part of his account is consistent with Scoble's description of using a "[j]oint manipulation to get [English's] arms behind him to

handcuff him." (*Id.* at PageID 276). English then recounts how another officer straddled his head between the officer's legs, effectively cutting off English's air flow and suffocating him. This aspect of his story aligns with Scoble's recollection that Gankosky was straddling English's head between his legs during the arrest.

English also disputes the officers' statements about his alleged resistance. For example, Gankosky claimed that English bit his leg sometime during the incident. But English denies ever biting anyone. And in his final allegation of physical force by TPD, English avers that another officer knelt on his ankle and twisted it with both hands, causing it to snap. The medical report on English's ankle following his arrest was inconclusive, stating: "it is difficult on today's examination both clinically and radiographically . . . to assess the extent of this injury." (R. 29-5, PageID 439). But it specifically declined to rule out "some form of trauma to his right ankle as a result of his altercation with the police department." (*Id.*).

Although the full encounter is not on video, a studio guest recorded a 90-second clip showing four officers on top of English—including one on each side, one near his head, and one by his feet. In the clip, English does not appear to physically resist. TPD charged English with assault on a police officer, resisting arrest, obstructing official business and chronic nuisance. A grand jury indicted him on the assault, resisting arrest, and obstruction charges, but a trial jury later acquitted him of every charge.

In June 2019, English sued the City of Toledo and several officers under 42 U.S.C. § 1983, alleging excessive force, equal protection, and due process claims under the Fourth and Fourteenth Amendments.[1]  He also brought a state-law claim for assault arising from the November 2017

---

[1] English dropped the City of Toledo as a named defendant in his amended complaint.

arrest, and a municipal liability failure-to-train claim against Kral.[2] While that case was pending, TPD arrested English again at a different venue.

The second arrest occurred on January 12, 2020. TPD officers had responded to a gunshot call and encountered English standing at the entrance of another after-hours bar. Officers claimed that English tried to block their entry, so they arrested him and charged him with resisting arrest and obstructing official business.

In his amended complaint, English alleges that TPD officers assaulted him during this arrest too. He alleges an officer holding a crowbar yelled "stop resisting" even though he was not resisting. (*Amended Compl.*, R. 12, PageID 70, ¶ 26). He also alleges that another TPD officer slammed him against the building wall. As part of a diversion program, English signed a Release of all Claims ("release agreement") against the officers involved in the January 2020 arrest. Release notwithstanding, he amended his complaint in this case to include excessive-force and assault claims for the events surrounding the January 2020 arrest and a wrongful detention claim for the November 2017 arrest. According to English, the charges were meritless and TPD was trying to silence him for filing this suit.

The district court found there were no genuine issues of material fact and that the officers were entitled to qualified immunity. It therefore granted summary judgment on all of English's federal claims and declined to exercise supplemental jurisdiction over his state-law claims. English now appeals.

---

[2] Though English named Kral in his official capacity rather than the City of Toledo in his failure-to-train claim, such official capacity claims are nevertheless considered actions against the municipality. *See Miller v. Calhoun County*, 408 F.3d 803, 817 n.3 (6th Cir. 2005).

**II.**

We review de novo the district court's grant of summary judgment. *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 526 (6th Cir. 2023). Summary judgment is proper when no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is whether the evidence presents a sufficient disagreement to require submission of the non-movant's claims to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). If the movant establishes the lack of a genuine issue of material fact, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

**III.**

**A. January 2020 Excessive Force**

We first address whether the district court improperly granted summary judgment as to English's claims relating to his January 2020 arrest. As an initial matter, English asserts that Defendants used excessive force during his January 2020 arrest, but the amended complaint lists the arrest date as July 12, 2020, rather than January 12, 2020. (*See Amended Compl.* R. 12, PageID 73, ¶ 48). Even excusing this apparent mistake as a scrivener's error and assuming he intended to reference the January incident, English's claim nonetheless fails.

English argues that the district court was wrong to enforce the release agreement he signed in exchange for participation in a diversion program. He claims that the district court misapplied

relevant factors it was required to consider and that genuine disputes of fact about his knowledge and voluntariness when he signed the agreement should have precluded summary judgment.

English correctly points out that under *Town of Newton v. Rumery*, 480 U.S. 386, 398 (1987), a release agreement must be voluntary, free from prosecutorial misconduct, and consistent with public interests. And the burden of proving enforceability lies with the party seeking to enforce the agreement. *Coughlen v. Coots*, 5 F.3d 970, 974 (6th Cir. 1993). The Defendants failed to address *Rumery*'s requirements in their motion for summary judgment. Yet the district court, on its own review of the record, found that the requirements were satisfied.

While the district court's failure to hold Defendants to their burden raises a serious question about this aspect of its analysis, ultimately, we need not decide the issue. For the district court offered alternative grounds for granting Defendants summary judgment for the January 2020 excessive-force claims. And the court's alternative rationale stands on surer footing: English's failure to present evidence linking specific defendants to the alleged unconstitutional conduct from this arrest leaves English unable to establish the existence of a genuine dispute of material fact.

English has failed to adduce evidence that any particular defendant engaged in the conduct of which he complains. After all, to survive summary judgment on an excessive-force claim, English must show that each named defendant personally participated in the misconduct. *See Fazica v. Jordan*, 926 F.3d 283, 289 (6th Cir. 2019). Mere presence at the scene, without evidence of direct responsibility for the conduct, is generally not enough to impose liability. *Id.* (citation omitted). As discussed in Section V below, the law does recognize the possibility that a plaintiff may be unable to pinpoint each officer's specific actions and, therefore, permits a plaintiff to show that the defendants were part of a small group directly involved in the alleged misconduct. *Pineda v. Hamilton County*, 977 F.3d 483, 492–93 (6th Cir. 2020). But even in such circumstances, the

plaintiff still bears the burden of connecting defendants to the alleged misconduct. *Id.* at 493. English did not meet this burden as it relates to the January 2020 arrest.

Defendants assert that none of the named defendants were present at English's January 2020 arrest. And at the summary judgment stage, English remained unable to marshal any evidence identifying which officers allegedly used force against him during this arrest. Instead, he vaguely asserted in his response to the motion for summary judgment that "[w]hen the above name[d] officers saw him, [he] was immediately assaulted." (R. 36, PageID 540). English continues, on appeal, to point to no evidence that would tie any specific defendant to the various complained-of uses of force he described in his amended complaint or the physical attack referenced in his affidavit. Nor does English point to evidence establishing Defendants' presence at the scene. Instead, English's affidavit names three officers who allegedly attacked him, none of whom are defendants here. Thus, on this record, English cannot meet even *Pineda*'s more modest requirement to place any defendant among a small group of actors involved in the alleged misconduct. The district court, therefore, correctly found that English did not create a triable issue of fact against any named defendant relating to the January 2020 arrest.

Moreover, when a district court provides two independent grounds for dismissal and an appellant challenges one, but not the other ground, he waives the appeal issue that was subject to the alternative analysis. *See White Oak Prop. Dev., LLC v. Washington Township*, 606 F.3d 842, 854 (6th Cir. 2010); *United States v. Thornton*, 609 F.3d 373, 380 (6th Cir. 2010). Because English does not challenge this alternative ruling on appeal—mentioning it neither in his opening brief nor in reply—he has waived any argument to the contrary. English's failure to challenge the district court's alternative holding dooms this claim on his appeal. Thus, because English failed to

challenge the alternative ruling, he has waived any argument related to the dismissal of his claims related to the January 2020 arrest. *See White Oak Prop. Dev.*, 606 F.3d at 854.

**IV.**

**A. Qualified Immunity – November 2017 Arrest**

We next turn to English's November 2017 arrest and review de novo the district court's grant of qualified immunity. *See Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006). Qualified immunity protects government officials for actions taken within their official authority, provided those actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity applies unless the evidence, viewed in the light most favorable to the plaintiff, allows a reasonable juror to find that "(1) the defendant violated a constitutional right; and (2) the right was clearly established." *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023) (quoting *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)).

English advances a two-part rationale for his claim of unreasonable seizure under the Fourth Amendment. First, he asserts that Defendants unreasonably seized him because the officers had no legal basis to arrest him when they entered his studio without a warrant. Second, he alleges that Defendants violated his Fourth Amendment right to be free from excessive force. *See Farris v. Oakland County*, 96 F.4th 956, 964 (6th Cir. 2024). We consider the merits of each of these arguments in turn.

*1. Probable Cause.* English argues that Defendants lacked probable cause for his November 2017 arrest.[3] The Fourth Amendment allows police officers to arrest a suspect without

---

[3] We do not understand English to raise a standalone claim for unlawful arrest under the Fourth Amendment. He generally alleges constitutional violations under § 1983, claiming that

a warrant as long as the officers have probable cause to believe that the suspect has committed or is committing an offense. *See United States v. Watson*, 423 U.S. 411, 414–19 (1976).

Defendants argued before the district court that the state grand jury's indictment established a presumption of probable cause for English's November 2017 arrest. The district court adopted that reasoning and declined to independently assess whether the factual record supported a finding of probable cause. But in *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 307 n.13 (6th Cir. 2005), we declared explicitly what we previously had held only implicitly: "[A]fter-the-fact grand jury involvement cannot serve to validate a prior arrest." That is the case here; Defendants arrested English based on their on-the-scene assessment of the situation, without a warrant or any grand jury involvement. Thus, their reliance on English's later indictment is misplaced. And the district court erred in applying a presumption of probable cause.

In assessing whether Defendants had probable cause for English's warrantless arrest, we must examine the events leading up to the arrest and decide "'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount[ed] to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Probable cause depends on the totality of the circumstances and is a "fluid concept." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). It "requires only a probability or substantial chance of criminal activity," not definitive proof. *Id.* at 243 n.13. Probable cause, therefore, "is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Kaley v. United States*, 571

---

Defendants unreasonably seized him through "physical force and a show of authority," in violation of his right to be free from unreasonable searches and seizures. (*Amended Compl.*, R. 12, PageID 71). His briefing also repeatedly references "unlawful arrest," though and emphasizes the warrantless nature of his arrest. And the presence or absence of probable cause can be relevant in assessing the objective reasonableness of the officers' seizure of the plaintiff. For this reason, we consider whether probable cause existed within the context of his claim of unreasonable seizure.

U.S. 320, 338 (2014)). Reviewing de novo, we consider the facts in the light most favorable to English to determine whether a jury could reasonably conclude that it was objectively reasonable for an officer to believe that English had probably committed or was committing a crime preceding his November 2017 arrest.

Defendants argue that they had probable cause to arrest English for violating Toledo's chronic-nuisance law, a misdemeanor under Toledo, Ohio Mun. Code § 541.18 (2005) [T.M.C.].[4] First, a threshold point: English states that no exigent circumstances justified the warrantless entry to arrest him for a misdemeanor offense. But he has not adequately developed any argument that there was a violation of his rights based on the officers' entry into the property. For instance, he provides little information about the nature and extent of his property interest and status as it relates to the building containing his studio. And because "it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones," we deem this argument waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citation modified).

Still, setting the warrant issue aside, factual disputes foreclose a determination as to probable cause at this stage. Under Toledo's nuisance ordinance, a public nuisance occurs when two or more qualifying offenses arise from a party or social gathering. T.M.C. § 541.18(a)(1). Examples of such offenses include disorderly conduct, drug use, vehicle parking that obstructs the free flow of traffic on public streets and sidewalks, excessive noise, or other disruptive or illegal behavior—occurring either at the party location or nearby. *Id.*

---

[4] Although Defendants allege that English forcibly closed the door on Gankosky's hand, they do not argue that this action supplied probable cause for the arrest. We therefore do not consider it in the probable-cause analysis.

TPD officers testified that they believed they had probable cause based on two predicate offenses: parking violations they saw and loud music they heard when they arrived at the studio. English says the violations were a mere pretense to get inside the building. He does not, however, address the parking violations in his briefing, so we take this fact as undisputed. Yet even accepting that such parking violations took place, T.M.C. § 541.18 requires a second predicate offense. Here, Defendants cite excessive noise. Yet on that front, the evidence is disputed.

TPD's sworn summons claims that English allowed music "that could be heard from a far distance." (R. 37-3, PageID 600). And as noted earlier, Gankosky testified that the volume was so high one could feel the bass vibration on one's chest, and Scoble testified that it was "obscenely loud." (*Trial Tr.*, R. 29-1, PageID 241). But English disputes the officers' version of events in his affidavit, stating that there was no loud music at all. He adds that no noise complaint prompted the officers' arrival. And although Defendants claim that the "catalyst" alerting TPD to English's studio that night included noise complaints, they present no evidence of such complaints. (*Appellee's Br.*, ECF 40 at 22).

This evidentiary dispute creates a genuine dispute of fact as to the circumstances on the scene. A jury could just as well believe English's statement that the music was not loud as it could believe the officers' statements that it was. And without loud music, there would be no second offense to satisfy the ordinance. Consequently, whether it was objectively reasonable for the officers to believe English violated Toledo's chronic-nuisance law is unresolvable on this record.

*2. Excessive Force.* English asserts that Defendants used excessive force in carrying out his November 2017 arrest. He argues that the officers are not entitled to qualified immunity for their actions.

a. Violation of a Constitutional Right. The Fourth Amendment protects individuals against excessive force by government officials. *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022). While police officers may "use some degree of physical coercion or threat" to conduct arrests or investigatory stops, they must ensure that any force used remains reasonable. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1004 (6th Cir. 2024). We assess reasonableness from an objective standard, considering the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396. In doing so, we consider: "1) the severity of the crime at issue; 2) whether the suspect posed an immediate threat to the safety of the police officer or others; and 3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Grawey v. Drury*, 567 F.3d 302, 310 (6th Cir. 2009) (citing *Graham*, 490 U.S. at 396). Our "inquiry into reasonableness . . . requires assessing the totality of the circumstances." *Barnes v. Felix*, 145 S. Ct. 1353, 1356 (2025) (internal quotation marks and citation omitted). As to the first *Graham* factor, Defendants concede that they were in the process of apprehending English "for relatively minor crimes." (*Appellee's Br.*, ECF 40 at 26–27). But they argue that the "totality of the circumstances" weighs in their favor when considering the other two factors. (*Id.*). We disagree.

*i. Threat to Safety.* Beginning with the question of immediate threat, the district court found there was no sign that English posed an immediate threat to officer safety. (*See Mem. Opinion*, R. 39, PageID 859 ("[T]here are no indications from either party that he posed a heightened threat to officer safety.")). Yet Defendants argue that, from their perspective, English threatened their safety when he allegedly showed them hostility, "forcibly slammed" Gankosky's hand between the front door and its metal frame, moved into a crowded venue after they informed him that he was under arrest, and bit Gankosky's leg while officers completed the arrest. (*Appellee's Br.*, ECF 40 at 27). Officer testimony at English's trial supports these allegations,

but—with the exception of the existence of a crowd in the venue—English disputes each factual allegation.

We construe the facts in the record in the light most favorable to English. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004), *cert. denied*, 544 U.S. 975 (2005); *see also Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010) ( "When the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept that evidence as true." (citation omitted)). And here, English denies ever biting "Gankosky's leg or any other part of any officer." (*English Aff.*, R. 37-1, PageID 585, ¶ 71). He also denies knowing Defendants intended to arrest him, claiming Defendants never told him he was under arrest. Further, he characterizes the door incident as him merely "return[ing] inside [his] studio because [he] knew the interaction was leading to an unnecessary altercation and harassment initiated . . . by TPD officers." (*Id.* at PageID 583, ¶ 57).

The district court—and now this court—have only conflicting testimony to evaluate whether English threatened the officers' safety. And making credibility determinations at this stage is improper. *See Anderson*, 477 U.S. at 255. "It is the province of the jury, not the court, to decide on the credibility of the defendant's account of the need for force." *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994). Construing the facts in the light most favorable to English, he raises a genuine dispute of material fact—a question for a jury, not the court.

*ii. Active Resistance.* The record also contains conflicting evidence regarding whether English actively resisted arrest. The district court accepted that there was a genuine issue of material fact as to whether English physically resisted. But it still found that English admitted to "evading" arrest and making "adversarial verbal statements" that amounted to active resistance in the form of "volitional and conscious defiance." (*Mem. Opinion*, R. 39, PageID 860–61).

Active resistance requires "some outward manifestation—either verbal or physical" that suggests "volitional and conscious defiance." *Shumate v. City of Adrian*, 44 F.4th 427, 446 (6th Cir. 2022) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013)). Active resistance may involve "physical force, a show of force, or verbal hostility coupled with failure to comply with police orders." *Jackson v. Washtenaw County*, 678 F. App'x 302, 306 (6th Cir. 2017). Verbal hostility can also amount to active resistance. *Shumate*, 44 F.4th at 447. Still, mere verbal jabs or non-threatening language will amount to active resistance only if accompanied by overtly threatening speech or conduct. *Id.* at 448; *cf. Caie v. West Bloomfield Township*, 485 F. App'x 92, 94, 96–97 (6th Cir. 2012) (finding active resistance when the plaintiff implied he had a gun and threatened to fight the police).

Consider the undisputed facts. First, as earlier discussed, officers arrived at English's studio on November 24, 2017 without a warrant and observed multiple parking violations. They encountered English at the front door, where Scoble warned him that failure to turn down the music would result in arrest. Defendants claim, and English does not dispute, that English "repeatedly re-enter[ed] and re-exit[ed]" the studio. (*Appellee's. Br.*, ECF 40, at 9). When English tried to go inside one last time, Gankosky reached for him, but English had turned around. The officers then followed English into the building, where other people were already congregated. And once the officers reached English, they pinned him to the ground and arrested him.

Despite this general sequence, key facts remain disputed. For one thing, the parties offer diverging narratives about the confrontation inside the studio. Officers claim they were in "hot pursuit," while English claims he merely returned inside, thereby implying that he was not evading arrest. They also disagree on whether English was aware he was under arrest. Scoble says he advised him at the door, while English maintains he did not know he was being arrested until

officers took him to the ground. This last point is important; whether English was on notice that he was under arrest will necessarily color any analysis of the parties' conduct.

The totality of the circumstances is not so one-sided that it leads only to the conclusion that English was evading arrest. Nor do we agree with the district court's conclusion that he admitted to any such evasion. In English's sworn statement, he explains that he thought he was "being attacked" and "harassed," and therefore chose to return inside to avoid the "unnecessary altercation." (*English Aff.*, R. 37-1, PageID 583–84). Accepting English's version of events as true, that no officer had declared him under arrest, he could not have been evading an arrest of which he was unaware, let alone admitting to doing so.

Still, the district court relied on two statements in English's affidavit to conclude that he admitted evasion: that he (1) "returned inside [his] studio . . . [after] Lieutenant Scoble ordered Officer Gankosky to arrest [him]," and (2) "was extremely emotional" and "expressing [himself] vocally in an angry and frustrated manner." (*Mem. Opinion*, R. 39, PageID 860 (second and fourth alterations in original)). But as to the first statement, the district court's recitation appears to make an inference in favor of Defendants' rendition of events rather than English's. English neither states nor implies that Scoble ordered his arrest before English went back inside. Rather, English attests that "TPD officers threatened to arrest me, and I returned inside my studio." (*English Aff.*, R. 37-1, PageID 583, ¶ 57). Then, in the next paragraph, English states "[t]hat TPD Lieutenant Scoble ordered Officer Gankosky to arrest me." (*Id.* ¶ 58).

In assessing whether a reasonable officer on the scene would have understood English's actions as evading, the court remains obliged to view the facts in the light most favorable to English and accord all reasonable inferences to English. English has maintained that the officers threatened arrest if he did not turn down the music. The reasonable inference from the ordering of his

statements is that his retreat followed such a threat to arrest, not the actual order to arrest. In short, without the district court's negative inference, English's statement is no admission of evading arrest.

And as to English's characterizations of his demeanor and manner of speaking, angry vocalization alone is not enough to prove active resistance. *See Eldridge*, 533 F. App'x at 535. Considering our conclusion that English's physical retreat did not necessarily follow the order to arrest, Defendants must look elsewhere for a deliberate act of defiance.

For his part, English said that "[he] was never kicking any of the officers, or trying to resist in anyway [*sic*]." (*English Aff.*, R. 37-1, PageID 584–85, ¶ 69). While the part of his statement denying that he tried to resist in any way is somewhat conclusory, his words—combined with his actions that are not in dispute—do not show any deliberate acts in defiance of police orders. For example, unlike in *Jackson*, where the plaintiff's hand movement could reasonably indicate he may possess a weapon, it is undisputed that English did not engage in such overtly threatening conduct. *See* 678 F. App'x at 306. Nor do Defendants point to any particular statements by English that were threatening or provoking in a way that they could reasonably perceive a dangerous situation. *See Caie*, 485 F. App'x at 96. As a result, English's "admissions" here do not weigh in Defendants' favor. Under our caselaw, a reasonable officer could not construe English's angry vocalizations and use of foul language during handcuffing as active resistance—especially when the government does not show deliberate defiance.

On appeal, Defendants point to other physical actions which they say showed active resistance, such as English's act of closing the studio door, which they say injured Gankosky. But while they describe the door as being "forcibly" shut, they never assert that English acted deliberately or with intent to harm. And "forcibly" does not necessarily equate to purposeful

defiance. Lastly, in response to the officers' assertion of English turtling his arms beneath his body, English declares that he "was never forcibly holding [his] arms in any position to resist the . . . arrest, and that any movement or lack thereof of [his] arms was in response to the . . . force inflicted on [him] by the officers." (*Id.* ¶ 70). And the video indeed shows English mostly subdued under the body weight of multiple officers; he wriggles briefly while officers appear to straddle his head and attempt to handcuff him. **[23-3860 Ex. 3 at 00:40].** Viewing these facts in English's favor, the record shows only that English reentered the building after being told to turn down the music. This conduct, without more, does not meet the standard for active resistance. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 959 (6th Cir. 2013) (finding the mere act of fleeing did not justify an officer's use of force); *Saalim*, 97 F.4th at 1007–08 (finding the "failure to present . . . hands for handcuffing" insufficient and contrasting cases in which the arrestee took "drastic measures to avoid being handcuffed" and exhibited "erratic and dangerous behavior . . . prior to being handcuffed").

All in all, disputes in the record cannot be resolved relating to (1) whether officers advised English he was being arrested; (2) whether English slammed Gankosky's hand in a metal door and later bit him; and (3) whether English's physical movements during the altercation included moving his arms to prevent handcuff placement. Thus, English presents a genuine question of material fact as to whether he actively resisted police orders.

*iii. Totality of the Circumstances.* While the *Graham* factors help guide our analysis, the ultimate question remains "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Balancing "the nature and quality of the intrusion on [English's] Fourth Amendment interests against the countervailing governmental interests at stake," as required by

*Graham*, a rational jury could conclude that TPD officers violated English's Fourth Amendment right to be free from excessive force. *Id.*

The force described by English and depicted in the video from the November 2017 arrest is substantial given the minor nature of English's charges and the lack of any imminent threat to the officers. And although the video footage offered as evidence is incomplete, it supports English's account, showing him prone on the ground with four officers pressing their weight onto him while several others stand nearby. As already established, English does not appear to physically resist in the video. One officer repositions himself directly over English's head and neck.

English details, in his affidavit, the considerable force he experienced. By his account, officers tackled him and forced his face into the floor with so much pressure that he felt his skull being crushed. At least four officers used their body weight to restrain him. The video confirms that one officer held each of English's sides, pinning him to the floor while pushing his arms away from his back. Another officer knelt directly on English's back, and a fourth officer bent and grabbed English's ankles, restraining them. Recall that English further claims that this officer "knelt directly on [his] ankle and twisted it in a jerking motion with both hands, causing [his] ankle to snap." And later, after the officers handcuffed English, another officer moved to English's head. This officer straddled English's head, pushed downward, and squeezed it between his thighs in a manner that made English feel suffocated.

On the other hand, the countervailing government interest was relatively weak. As the district court correctly concluded, English's suspected crimes were minor, and the record lacks sufficient evidence to establish that he posed an immediate threat to officer safety. We agree with

the court's assessment that, under the circumstances, this weighs against the use of significant force.

Defendants' own testimony supports their arguments. But considering that Defendants' allegations of hand-slamming and leg-biting are contested, a rational jury could find that the force that ensued after four officers had already subdued English was excessive. *See Phelps v. Coy*, 286 F.3d 295, 298, 301 (6th Cir. 2002) (affirming that added physical force was unnecessary to gain control of an arrestee when he was already handcuffed with an officer on top of him). The added force once English was already on the ground, as stated in his sworn testimony, resulted in an injured ankle, along with the physical sensation of his skull being crushed and experiencing suffocation. Ultimately, viewing the evidence in the light most favorable to English, a juror could reasonably conclude that the Defendants' use of force against English was excessive and violated the Fourth Amendment.

b. Clearly Established Right. English alleges that officers used excessive force by (1) kneeling on his ankle and twisting it in a jerking motion; (2) forcing his face to the ground with such pressure that he felt his skull being crushed; (3) piling their full body weight on him after they had already handcuffed him, making it hard to breathe; and (4) straddling his head and squeezing it between the officer's thighs, cutting off his airflow. To overcome qualified immunity, English must also show that his right to be free from this type of force was clearly established at the time of the alleged violation. A right is "clearly established" if it has "a sufficiently clear foundation in then-existing precedent." *Wesby*, 583 U.S. at 63. In English's case, this means that the contours of the right must have been established by or before November 24, 2017. While English need not identify a case directly on point, existing precedent must place the statutory or

constitutional question "beyond debate." *Saalim*, 97 F.4th at 1009 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

We have consistently held that officers may not use force against detainees who are subdued and under control. *See, e.g.*, *Grawey*, 567 F.3d at 314 (collecting cases). For example, it is well established that "[p]eople who pose no safety risk to the police [have a right] to be free from gratuitous violence during arrest." *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006). Examples of gratuitous force have included officers breaking an arrestee's arm when the arrestee was passively resisting arrest. *See, e.g.*, *Norton v. Stille*, 526 F. App'x 509, 512–14 (6th Cir. 2013); *see also Williams v. Morgan*, 652 F. App'x 365, 374 (6th Cir. 2016). As discussed above, at least four officers were using their body weight to restrain English when he alleges TPD officers injured his ankle, causing him to be on crutches for an extended period of time after that night. If true, such an injury would significantly impair his ability to flee or pose any threat that might justify further force.

English's other allegations of force, if proven, also violate clearly established law. For instance, this court has found it "obvious" that an officer cannot push a handcuffed detainee's face into the ground when there is no safety threat. *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 408 (6th Cir. 2009). While English was not yet fully handcuffed at the time of the use of force, he alleges that officers had already forced him to the ground, pinned his limbs, and restricted his movement. Under those circumstances, forcibly driving his face into the floor was similarly excessive. So too was the officer's decision to kneel on English while he was lying face-down and after he had been handcuffed. In *Champion*, we held it was clearly established that applying pressure to the back of an individual "in a face-down prone position" who is no longer resisting and poses no safety threat violates the Fourth Amendment. 380 F.3d at 903–04. In doing

so, we emphasized that such pressure creates "asphyxiating conditions" and is unlawful when used against a restrained person. *Id.* Here, as in *Champion*, English alleges that officers used body weight to restrain him in a prone position after he had been subdued. The video confirms that English was already immobilized when the officer applied body weight, and the officers do not identify any ongoing safety threat that would justify that added force. Given the similarities between the facts in English's case and those set forth in the cited cases, English has shown that the right he claims is clearly established.

The district court's findings are noteworthy. It determined that English posed no immediate threat to the officers or others, making gratuitous violence against him unjustifiable. At bottom, given the many genuine issues of material fact—including the degree of force used and whether English posed an immediate threat or resisted arrest—Defendants are not entitled to qualified immunity at the summary judgment stage. And the district court erred in concluding otherwise.

## V.

We next consider whether the district court improperly dismissed the claims against named Defendants officers Poskarbiewicz, Sutphin, and Thomas. Defendants argued in the district court that these three officers were not involved in either of English's arrests, while English contends that he can show they were present at his November 2017 arrest. The district court did not reach these specific officers' liability, instead broadly granting qualified immunity to all Defendants. But while the qualified-immunity defense no longer applies, we may "affirm a district court's

decision on any ground that the record proves correct, including a ground . . . raised but that the district court did not reach." *Wallace v. United States*, 43 F.4th 595, 606 (6th Cir. 2022).

English claims that Poskarbiewicz, Sutphin, and Thomas were present at his November 2017 arrest and were part of a broader pattern of harassment and oppression by TPD. He argues that his placing them at the scene implicates them in constitutional violations, particularly because he claims they were part of the group of officers who allegedly harassed and assaulted him. English contends that these officers supported the unlawful entry into his business and participated in the events leading to his arrest.

Defendants, on the other hand, argue that English failed to provide concrete evidence linking these officers to the alleged misconduct. They point out that no trial testimony or documentary evidence supports the assertion that these specific officers were present or actively participated in the incident. Instead, Defendants claim that English's identification of the officers is speculative and uncorroborated.

To begin, Defendants' argument that the named officers were not present is without avail. The party moving for summary judgment has the burden of proving the absence of a genuine dispute as to the material facts. *Celotex*, 477 U.S. at 323. Defendants cite only the omission of these officers' names from the testimony in English's criminal trial. But that absence does not affirmatively establish that they were not present. Indeed, English specifically states that the three officers participated in the alleged acts of excessive force. Viewing the facts in the light most favorable to English, as we must at this stage, his sworn statements are sufficient to create a genuine dispute as to whether Poskarbiewicz, Sutphin, and Thomas were present.

True, beyond simply naming these officers, English must establish that they either actively participated in the alleged misconduct or were part of a small, identifiable group of officers collectively responsible for the unconstitutional acts. *See Pineda*, 977 F.3d at 492; *Fazica*, 926 F.3d at 293. And even if English cannot distinguish the specific actions of Poskarbiewicz, Sutphin, and Thomas, each may still be held liable as members of the defined group directly involved in the misconduct. *See Pineda*, 977 F.3d at 492–93. That said, his uncertainty must stem from involuntary limitations, such as obstructed sight, or officers concealing their identity. *Id.* at 493–94. And the record supports a reasonable inference of such a limitation here.

English places Poskarbiewicz, Sutphin, and Thomas within the group of named officers that he alleges participated in the excessive force. And from the video, which shows him face down during the incident, a jury could reasonably infer that he could not observe or identify the specific actions of every officer from that position. Whether English's inability to distinguish their conduct is justified is a factual question. *See Grinnell v. City of Taylor*, 2022 WL 1562291, at *7 (6th Cir. May 18, 2022) (finding that a plaintiff's failure to identify individual officers due to being face down during an assault presented a factual issue). Consequently, Poskarbiewicz's, Sutphin's, and Thomas's involvement presents a genuine dispute of material fact for a jury to resolve.

## VI.

The district court declined to exercise supplemental jurisdiction over English's state-law claims after dismissing the federal claims, citing "judicial economy and avoidance of duplicative litigation." (*Mem. Opinion*, R. 39, PageID 867). English challenges this decision, arguing that the

state-law claims should have survived because they raise valid issues under Ohio state law. However, the district court did not conduct a substantive analysis of the merits of these claims.

This court reviews a district court's decision to decline to exercise supplemental jurisdiction for abuse of discretion. *Packard v. Farmers Ins. of Columbus Inc.*, 423 F. App'x 580, 584 (6th Cir. 2011). An abuse of discretion occurs when the district court makes "a clear error of judgment" in weighing relevant factors. *Id.* District courts may decline supplemental jurisdiction in the interests "of judicial economy, convenience, fairness, and comity" to state courts. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

Because we have concluded that the district court's finding of qualified immunity was improper, its sole basis for declining supplemental jurisdiction no longer applies. The district court's only rationale was that "[i]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well." (*Mem. Opinion*, R. 39, PageID 867). This reasoning is insufficient given our determination that the federal claims remain viable. We remand the state-law claims so the district court can properly balance the relevant factors and determine whether to exercise supplemental jurisdiction.

**VII.**

### A. Municipal Liability Claim

*Failure to Train.* Lastly, English challenges the district court's dismissal of his *Monell* claim, in which he alleged that Chief Kral is liable, in his official capacity, under § 1983 for his deliberate failure to train the named officers. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). A claim against officials in their official capacities is effectively a claim against the municipality itself. *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir.

2016). In this case, that means the City of Toledo, of which TPD is a part. To hold a municipality liable, English must prove that a "policy or custom" caused the violation of his rights. *Monell*, 436 U.S. at 694. And he can do so by pointing to: (1) an illegal official policy or law; (2) an official with decision-making authority ratified illegal actions; (3) a policy of inadequate training or supervision; or (4) a custom of tolerating or ignoring constitutional violations. *Wright v. City of Euclid*, 962 F.3d 852, 879–80 (6th Cir. 2020).

At the summary judgment stage, Kral needed only to demonstrate the lack of evidence supporting English's claim. *Celotex*, 477 U.S. at 325. And once he did, the burden shifted to English to provide specific evidence, such as affidavits or depositions, showing genuine issues of material fact. *Id.* at 324.

Kral met this burden by pointing to a lack of evidence supporting key elements of English's claim. He argued that: (1) English failed to identify a policy that caused his alleged injury; (2) he presented no evidence of prior constitutional violations indicating a pattern of misconduct; (3) he offered no proof of inadequate training or supervision; and (4) he did not show a link between his injury and deliberate indifference by the City of Toledo.

In response, English alleged that Kral, as the final policymaker, issued or allowed directives targeting English and his African American clientele. But these allegations lacked specific facts or evidence to support them. And conclusory allegations alone cannot create a genuine dispute of material fact. *See Harvey v. Campbell County*, 453 F. App'x 557, 560 (6th Cir. 2011). English identified no directive issued by Kral, provided no evidence that Kral approved the officers' actions, demonstrated no pattern of constitutional misconduct, and offered no evidence on the adequacy of officer training. Without such evidence, English's *Monell* claim fails.

**VIII.**

For the reasons set for above we AFFIRM the district court's dismissal of (1) the Fourth Amendment claims related to the January 2020 arrest (Count I in part) and (2) the *Monell* claim against Kral for failure to train (Count III). We REVERSE the grant of summary judgment on the Fourth Amendment claims related to the November 2017 arrest (Count I in part). Finally, we REVERSE the dismissal of the state-law claims (Counts IV and V) and REMAND for further proceedings consistent with this opinion.